**Opinion issued March 19, 2024.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-23-00691-CV**

_____

**IN THE INTEREST OF J.O.A.M. AKA J. M. AND P.S.R.M., CHILDREN**

_____

**NO. 01-23-00692-CV**

_____

**IN THE INTEREST OF A.O.P.-W. JR. AND A.O.P.-W., CHILDREN**

---

**On Appeal from the 312th District Court**
**Harris County, Texas**
**Trial Court Case No. 2022-13719 and 2017-45835**

---

**MEMORANDUM OPINION**

S.T.N. ("Mother") challenges the trial court's final decree terminating her

parental rights to her minor children J.O.A.M. aka J.M. ("Jayla") and P.S.R.M.

("Pia") based on the court's finding that Mother committed the predicate acts under Texas Family Code Section 161.001(b)(1)(D), (E), (M), (N), and (O). Mother argues there is legally and factually insufficient evidence supporting the trial court's findings that (1) she committed the predicate acts under Section 161.001(b)(1)(D), (E), (M), (N), and (O), and (2) termination of her parental rights was in Jayla's and Pia's best interest.

Mother also challenges the trial court's Order Modifying Prior Order modifying her parental rights to her minor children A.O.P.-W. JR. ("Anthony") and A.O.P.-W. ("Adrian") pursuant to Section 263.404 of the Texas Family Code. Mother argues there is legally and factually insufficient evidence supporting the appointment of Anthony's and Adrian's paternal grandmother as their sole managing conservator.

We affirm the decree of termination with respect to Jayla and Pia as well as the order modifying Mother's rights to Anthony and Adrian and appointing the boys' paternal grandmother as their sole managing conservator.

**Background[1]**

Mother has six children: Anthony, Adrian, C.C.D.M. ("Casey"), "BABY BOY N. aka INFANT M. aka T.M. ("Tyler"), Pia, and Jayla. A.O.P.-W. ("Aaron")

---

[1] To protect the children's privacy, we refer to the children, their family, and their foster parents using pseudonyms or their initials. The following background section and trial testimony is relevant to both appeals.

2

is the father of Anthony and Adrian. A.M. ("Alan") is the father of Mother's younger children: Casey, Tyler, Pia, and Jayla.[2]

On March 17, 2022, the Department filed in trial court cause number 2017-45835 an "Original Motion to Modify for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship." The Department sought to modify a July 2017 order appointing Mother and Aaron as Anthony's and Adrian's joint managing conservators, and to terminate Mother's and Aaron's parental rights to Anthony and Adrian.

On March 7, 2022, the Department filed in trial court cause number 2022-13719 an Original Petition for Protection of a Child for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship, seeking to terminate Mother's and Alan's parental rights to Jayla. On March 17, 2022, the Department filed in the same cause number its First Amended Petition for Protection of a Child for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship for Jayla, and an Original Suit for the protection of Pia seeking to terminate Mother's and Alan's parental rights to both girls.

---

[2] On August 5, 2022, the trial court issued an order terminating Mother's and Alan's parental rights to Casey, who was then four years old, and on August 12, 2022, the trial court issued an order terminating Mother's and Alan's parental rights to Tyler, who was then two years old. This appeal does not involve the termination orders for Casey or Tyler.

3

The trial court conducted a single bench trial for cause number 2017-45835, involving Adrian and Anthony, and cause number 2022-13719, involving Jayla and Pia.[3] When trial began, Anthony was 11 years old, Adrian was 9 years old, Pia was 2 years old, and Jayla was 1 year old.

## A. Witness Testimony

### 1. Andrea Johnson

Andrea Johnson is Anthony, Adrian, Pia, and Jayla's caseworker. Johnson testified that the Department was requesting termination of Mother's and Aaron's parental rights to Anthony and Adrian in trial court cause number 2017-45835, and termination of Mother's and Alan's parental rights to Pia and Jayla in trial court cause number 2022-13719.

Johnson testified that Anthony and Adrian initially came into the Department's care in March 2019 after Alan kidnapped Anthony, Adrian, Casey, and Mother at gunpoint. According to Johnson, Anthony and Adrian were placed in an agreed safety placement with their paternal grandmother A.W. ("Anna"). Casey, who was initially placed with his maternal grandmother J.N. ("Julie"), was later placed in foster care.

---

[3] The bench trial was conducted over several days on May 11, 2023, June 16, 2023, July 27–28, 2023, August 3, 2023, and August 25, 2023.

On December 18, 2019, the Department filed an Original Motion to Modify for Conservatorship and for Termination in Suit Affecting the Parent-Child Relationship involving Anthony and Adrian. Johnson testified the Department sought to modify a July 2017 order previously appointing Mother and Aaron as Anthony's and Adrian's joint managing conservators and to terminate Mother's and Aaron's parental rights to Anthony and Adrian. The Department filed a separate petition seeking to terminate Mother's and Alan's parental rights to Casey, and they filed a similar petition seeking to terminate Mother's and Alan's parental rights to Tyler after Tyler was born. Johnson testified the Department decided to seek termination of the parents' rights in December 2019, because Mother and Alan had been threatening to physically remove the children from their placements.

Mother's fourth child, Tyler, was born in February 2020. Tyler came into the Department's care because both he and Mother tested positive for marijuana when he was born, and Mother and Alan allegedly abandoned him at the hospital. When he was six or seven weeks old, Tyler was placed in the same foster home as Casey. The Department filed a petition seeking to terminate Mother's and Alan's parental rights to Tyler.

Johnson testified the Department prepared a family service plan ("FSP") for Mother setting forth the actions she needed to take to be reunified with her children. According to Johnson, Mother did not complete the services required by her FSP

5

and she blamed Alan for her inability to do so. Nevertheless, the trial court returned Anthony, Adrian, Casey, and Tyler to Mother in November 2021.

In January 2022, Mother and Alan were arrested in California for child endangerment. Anthony, Adrian, Casey, Tyler, and their younger sister Pia were removed from Mother's care by Child Protective Services and placed in foster care. Johnson testified that when they were initially taken into CPS's care, the children had "scars and marks on them," they were wearing soiled, oversized clothing that was not appropriate for cold weather, and Anthony was not wearing shoes. After Johnson confronted Mother with the police reports detailing the circumstances leading to Mother's arrest and the children's condition when the police encountered them in California, Mother told Johnson that the allegations were false. She also denied that she and Alan were together and claimed she took the children to California to visit Alan and go to the beach.

On March 10, 2022, Casey and Tyler's previous foster family drove to California to pick up the boys. Pia and Jayla, who was born in February 2022, were ultimately placed in the same foster home as Casey and Tyler. On March 25, 2022, Anthony and Adrian were transported back to Houston and placed with Anna. That month, the Department filed new petitions seeking to terminate Mother's and Aaron's parental rights to Anthony and Adrian and to terminate Mother's and Alan's parental rights to Pia and Jayla.

On May 11, 2022, the Department prepared and filed a new FSP for Mother with respect to Anthony, Adrian, Jayla, and Pia. Johnson, who was assigned to the children's cases in July 2022, went over the FSP with Mother during an August 31, 2022 family group conference. The FSP was made an order of the court during a September 2022 status hearing.

According to the FSP, the Department was concerned about Mother's ability to care for Anthony, Adrian, Jayla, and Pia because Mother had "left the children on the side of the road to panhandle in harsh weather conditions with no shoes and inappropriate clothing," had "a history of drug use and was positive at the birth of her second to youngest child," and had "placed the children in harm on multiple occasions." Johnson testified that to address the Department's concerns, the FSP required Mother to refrain from illegal activity, have stable housing and employment, participate in all court hearings, complete parenting classes, complete a substance abuse assessment and follow all recommendations, complete a psychological assessment and follow all recommendations, and participate in drug screenings. The FSP stated the Department's primary permanency goal for Anthony and Adrian was Alt Family: Relative/Fictive Kin, Adoption and the concurrent permanency goal for the boys was Alt Family: Relative/Fictive Kin, Conservatorship.

Johnson testified that Mother did not complete all of her FSP's requirements because, among other things, she did not maintain contact with the Department, maintain stable housing, or complete her required services. According to Johnson, Mother did not update the Department when she moved or changed her phone number, which happened frequently. The phone numbers Mother gave to Johnson were often disconnected and letters Johnson sent to the mailing addresses Mother provided were often returned. Johnson said she would find out that Mother had a new phone number or address when Mother would appear for a family group conference every three to six months. Johnson said that she went for at least four or five months without having a way to contact Mother. Johnson testified that Mother provided her with a new telephone number in December 2022 at the family group conference meeting and Mother provided her with a new address in January 2023.

Mother was also required to provide the Department with proof of stable housing. Johnson testified that while Mother would provide her with mailing addresses, Johnson did not know where Mother was living most of the time. At a court hearing in March 2023, Mother testified that she was living at an address on West Bellfort Avenue, but when Johnson spoke to a representative in the leasing office for the apartment complex located at that address, the representative told her Mother was not a tenant at that complex. According to Johnson, Mother never provided her with proof that she had stable housing, and Johnson still does not know

where Mother was living or if Mother had a safe place for the children to live if they were returned to her care.

With regard to Mother's services, Johnson testified that Mother did not begin participating in her required services until she completed her substance abuse assessment on January 26, 2023, approximately two weeks before the February 9, 2023 trial setting. Mother completed her psychological assessment on February 3, 2023. According to Johnson, Mother made an appointment for a psychological evaluation in August 2022, but she missed the appointment.

In addition to completing these assessments, Mother's FSP also required her to follow each assessment's recommendations. Johnson testified that the psychological assessment recommended that Mother attend eight to ten parenting classes, engage in individual therapy, participate in a domestic violence program, complete a psychiatric evaluation, continue doing random drug screenings, and participate in an outpatient substance abuse treatment program. As of the date of trial, Mother had completed the recommended psychiatric evaluation and parenting classes. Although she was still engaging in individual therapy, which included the domestic violence requirement, random drug screenings, and substance abuse outpatient treatment, Mother had not completed those requirements.

Johnson testified that Mother also did not complete her required services when the children were removed from her care in March 2019, and that Mother claimed

9

Alan had prevented her from doing so. Although Mother claimed she was not able to begin participating in services in the current case until January 2023 because she had trouble reaching the service providers, Mother did not tell Johnson that she was having difficulty scheduling services. Johnson testified that Mother had Johnson's contact information at all times.

Regarding Mother's drug testing requirements and drug use, Johnson testified that Mother tested positive for marijuana when Jayla was born in February 2022, and she took her first court-ordered drug test in this case in January 2023. According to Johnson, the three drug tests Mother took in 2023 were negative. Johnson tried contacting Mother about submitting to other random drug and court-ordered testing before January 2023, but Mother's phone number changed often, and Johnson had not been able to get in contact with Mother to schedule the tests. Johnson testified that Mother told the person conducting her substance abuse assessment in January 2023 that the last time she used marijuana was in December 2022. In addition to testing positive for marijuana when Jayla was born, Mother also tested positive for cocaine and marijuana when she was pregnant with Pia on August 19, 2020.

Johnson testified the Department was concerned about Mother's ability to protect the children from harm if they were returned to her care because Mother, who had been married to Alan for a few years, had repeatedly misled the court and the Department about the timing and nature of her contacts with Alan and Johnson

10

did not know if Mother would allow Alan to be around the children despite his past abusive and dangerous conduct towards Mother and the children.[4] The Department was also "very concerned" that if Mother had the right to know the children's addresses and where they attended school, she would share that information with Alan and he "could show up" and "try to take the kids again."

Johnson testified that during a hearing in January 2023, Mother claimed she had not been in contact with Alan since they were arrested in California in January 2022. When asked if she was aware of any criminal charges filed against Alan, Johnson testified that Alan had been arrested down the street from Julie's home in February 2022, and he was arrested for assaulting Mother at Julie's home in March 2023. Julie is Mother's mother. Mother did not disclose these incidents to Johnson. Johnson testified that on July 17, 2021, Alan was arrested for assaulting Mother while she was pregnant with Jayla. On April 5, 2022, the assault charge was dismissed at Mother's request. Mother's request to dismiss the assault charges against Alan was a major concern for the Department with respect to Mother's ability to protect the children from Alan.

Regarding Jayla and Pia, Johnson testified that the girls had been placed in the same foster home as Casey and Tyler. Johnson testified the trial court signed

---

[4] Johnson could not recall if Mother and Alan were married in 2017 or 2019. The copy of Mother's and Alan's marriage license admitted into evidence reflects that they were married on October 14, 2019.

11

final decrees terminating Mother's parental rights to Casey and Tyler on child endangerment grounds. *See* TEX. FAM. CODE § 161.001(b)(1)(D) & and (E). The decrees, which were admitted into evidence, were issued in August 2022.

Casey's and Tyler's foster parents, T.J. ("Tanya") and her husband K.J. ("Kevin"), adopted Casey and Tyler in May 2023, and they wanted to adopt Jayla and Pia. Johnson, who had visited the girls in Tanya's and Kevin's home, testified that Jayla and Pia were happy, "very much" bonded with Tanya and Kevin, and doing well in the home with Casey and Tyler. Johnson testified it would be in Jayla's and Pia's best interest to terminate Mother's parental rights, and if Mother's rights were terminated, the Department planned to allow Kevin and Tanya to adopt the girls. Johnson testified the Department was requesting termination of Mother's rights to Jayla and Pia under Subsections (D), (E), (M), (N), and (O).

Regarding Anthony and Adrian, Johnson testified that the boys are bonded with Anna, their paternal grandmother, and they are happy and doing well in her home. Johnson testified that Anthony and Adrian want to live with Anna and Anthony wants to maintain contact with Mother. Anna, who is a licensed foster parent, wants to adopt the boys if Mother's and Aaron's rights are terminated. Johnson testified that it was in Anthony's and Adrian's best interests to terminate Mother's and Aaron's parental rights and appoint the Department as the boys' managing conservator, so that Anna could adopt the boys.

When asked about other possible placements for the boys, Johnson testified that Julie's home study had been denied and although the Department was conducting a home study on Mother's sister, the study was not finalized, and the Department was concerned about the appropriateness of placing the children with Mother's sister.

Johnson, who had spoken to the boys' therapist and reviewed the therapist's notes, agreed that the boys' outcries of abuse indicated that the abuse happened at the hands of Alan while the children were in the care of Mother and Alan. Johnson also testified that Mother had missed several visits with Anthony and Adrian, and she never provided an explanation for her absences. According to Johnson, Anthony looked forward to visiting with Mother and her failure to show up affected him more than Adrian.

### 2. Anna

Anna is Anthony's and Adrian's paternal grandmother and a licensed foster parent. Her son Aaron is the boys' father. Anna testified that she knows Pia and Jayla, and Mother and Alan are the girls' biological parents. Anna met Mother when Mother was pregnant with Anthony. According to Anna, Mother and Aaron were in a relationship for approximately five years, and they lived with her after Anthony and Adrian were born. Anna testified that Mother did not use drugs when she lived

with her, Mother was a "good mom to the boys, and she didn't show any type of abuse at that time."

Mother moved out of Anna's home when Mother and Aaron broke up. According to Anna, Anthony and Adrian would split their time between Mother and Anna's home, where Anna and Aaron lived. Aaron continued to live with Anna after Mother moved out. When asked if she knew where Mother lived after she moved out, Anna testified Mother stayed with Mother's mother, Julie, and Anna would pick up the boys from Julie's home for visits.

According to Anna, Mother started dating Alan when Adrian and Anthony were two and three years old, respectively. Anna testified that although Mother's phone number changed a lot after she moved out of Anna's home, Anna was able to keep in contact with Mother until Mother and Alan started dating. After Mother and Alan started dating, Mother stopped calling Anna and Aaron and Anna and Aaron were frequently unable to reach Mother when they wanted to schedule a visit with the boys. According to Anna, the only way they could reach Mother was to contact Julie, and Julie would either take a message for Mother or let Mother know that Anna or Aaron had called for her. Anna testified their visits with the boys became shorter and less frequent, and Mother stopped allowing Anna and Aaron to visit the boys a few months after she started dating Alan. Anna testified that the longest period she went without seeing the boys was two years.

14

At some point, Mother moved in with her cousin. Anna learned of Mother's living situation when Mother's cousin contacted Anna after the police were called to their apartment for a welfare check for Anthony and Adrian. The cousin called Anna again about another incident in which the police were dispatched to the apartment. Although Anna went to the apartment each time Mother's cousin called, Anna was not able to see Anthony and Adrian either time. According to Anna, the police told her the boys were safe and she would need to go to court if she wanted to see the boys.

On March 13, 2019, an Amber Alert was issued for the children after Alan reportedly took Mother, Anthony, Adrian, and Casey from Julie's home at gunpoint.[5] After the police notified Anna that Anthony and Adrian had been found, Anna and Aaron went to the police station to see the boys. According to Anna, Alan was at the station, but he was not in custody. Anna testified that the boys were dirty, their hair was uncut, and they looked like "orphan children." According to Anna, Mother was very angry, and she confronted Julie outside the police station, accused her of causing the situation by getting the police involved, and Mother told Julie to stay out of her business. Mother went back inside the police station while Anna, Aaron and Julie waited outside. Anna testified that Mother, who did not appear to be angry with Alan, was standing next to him and they appeared to be a couple.

---

[5] Tyler, Pia, and Jayla had not been born when this occurred.

After several hours, the police released Anthony and Adrian to Anna and Aaron. According to Anna, the boys ran over to her and grabbed her. According to Anna, Anthony held Anna's arm as they drove away from the station, and he did not let go of her until they reached Anna's home.

The Department placed Anthony and Adrian with Anna after that night. Aaron was no longer living with her at the time. Anna testified that when Anthony and Adrian lived with her, the boys had their own bedroom, they performed "very well in school," and they "[w]ere able to eat every day when they wanted to."

Anna, who attended all the court hearings in that case, only remembered Mother attending one of the hearings. According to Anna, Mother testified during a show-cause hearing that she was not in a relationship with Alan, she did not want to be in a relationship with him, and she assured the court that Anthony and Adrian would be safe with her.

On November 4, 2021, Anthony and Adrian, who had been living with Anna since March 2019, were returned to Mother's care. Although she was not able to see or speak to the boys after they were returned to Mother, Anna exchanged text messages with them for a time and Mother told Anna that she would accept money if Anna and Aaron wanted to do anything for the boys.

Anna stated that she and Aaron were unable to check on the boys at school because they did not know the boys' whereabouts. They later learned the boys had

16

been enrolled in school in Cypress, Texas. When Anna and Aaron spoke to the principal of Anthony's school, they learned Anthony was not at the school and that Mother's sister had written a letter to the school informing them that Anthony would no longer be attending classes there. Anna and Aaron were given the same information about Adrian when they visited his school.

Anna testified that she did not know where the boys were after that, but in January 2022, she learned that the police in Pasadena, California investigated Alan and Mother for panhandling on a freeway off-ramp with Anthony, Adrian, Casey, Tyler, and Pia. According to the Pasadena Police Department's report, which was admitted into evidence as Department Exhibit 38, the officers, who arrived at the scene at 8:30 p.m., noted that the children were "severely neglected," malnourished, not dressed appropriately for the cold weather conditions that night, and had bruising to their faces and bodies. Child Protective Services in California took possession of the children after Mother and Alan were arrested at the scene. The police report states:

> [Anthony, who was 9 years old,] was not wearing shoes or socks. [Adrian, who was 7 years old,] had light scabbing around the bridge of his mouth and was wearing a dirty adult size sweater. [Casey, who was almost 4 years old,] had soiled himself and had bruising and scabbing on his cheeks and mouth. [Tyler, who was almost 2 years old,] soiled himself and was shivering and had on a dirty sweater. [Tyler] also suffered . . . from bruising and scabbing on his cheek and face. There was a small scab on the left side of his chest discovered after further examination. [Pia, who was 11 months old,] was in a stroller and was

17

being held by [Mother]. [Mother] accidentally admitted to being seven months pregnant.

I spoke briefly to [Anthony] who stated that they had not eaten since 11:00 am this morning. It should be noted that all the children appeared disheveled, cold and were huddling next to each other. [Casey and Tyler] were falling asleep from exhaustion and were seated on the sidewalk during my arrival.

. . .

[Mother] said that her family was traveling from Texas to Los Angeles and got dropped off by a truck coming from Arizona. Their plan was to stay with an Aunt that they believed lived in Los Angeles but they didn't have a contact number for her. When they arrived in Los Angeles she discovered that her Aunt was not an option for her family to stay with so they came to Pasadena.

[Mother] said that her plan now was to take the children back to Arizona to find a place to stay. [Mother] said they were low on money and was trying to get money from drivers coming off the freeway to pay for a Lyft driver. It should be noted that [Mother] was agitated while I was speaking with her and said she did not need any help from the police. I asked [Mother] what happened to [Anthony's] shoes[.] [Mother] said he lost them as they were walking. [Mother] was insistent that we leave her and the children alone. [Mother] refused to give additional information and had nothing further to add.

After Alan and Mother refused multiple offers for emergency shelter and food for the family, the officers arrested them for child endangerment. Alan, who had a handgun with a loaded magazine in his pocket, was also arrested for "being a convicted felon in possession of a loaded firearm and resisting arrest." The officers found a second magazine clip in a diaper bag.

Anna testified that Anthony and Adrian were in a foster home in California for several months before they were returned to her care. Anna, who spoked to the boys' foster mother every day, testified the boys cried every day and wanted to go home. Anthony and Adrian were transported back to Texas in March 2022 and placed back in Anna's home. Although the boys were "elated" to be back with Anna, they also had emotional and behavioral problems and Anna started them in therapy after they returned from California. According to Anna, Anthony was angry and had breakdowns at school. Anna had to go to campus to calm him down or take him home. Although not as bad as Anthony's behavioral and emotional issues, Adrian also had emotional struggles, and both boys suffered from recurrent nightmares and wanted to be in the same room as Anna. Anthony told Anna that Alan had punched him on his arm, back, and legs.

A letter from the boys' therapist was admitted into evidence. In the letter, the therapist stated that Anthony had disclosed to her that he and his family were abused by Alan. According to the letter, Anthony told his therapist that Alan "placed his hand over [Anthony's hand] and shot the lady, . . . drug her body while she was still alive in the bushes and stole her car." Anthony also disclosed to his therapist that Alan had "touched him on his private part and then slapped him," causing Anthony to fall and his mouth to bleed. According to the letter, Anthony "felt guilty [about] everything that had happened to his family."

19

Anna testified that Anthony and Adrian talked to her about their trip to California. They told Anna they did not know where they were going, they just got in the car as they were instructed. According to the boys, Alan threw their tablets down a sewer, and he threw most of their stuff away because "they did not need them." Anthony told Anna that Mother and Alan would leave them alone in motels and he would care for the younger kids while they were gone and make bottles to keep the youngest child quiet. The boys told Anna they did not have food to eat, and at some point during their trip to California, the family did not have a car and they had to walk. Anthony told Anna that Tyler, who was almost two years old, would cry while they were walking, and Alan would hit Tyler to stop the crying. According to Anthony, the family slept in abandoned buildings, under bridges, and under freeways.

Anna testified that Anthony told her he saw Mother and Alan doing "adult stuff" in the motels and the affidavit attached to the Department's petition states, "The older children disclosed physical abuse, drug usage and domestic violence in their presence," and Mother has "allowed the children to be in the presence of [Alan] and they both have engaged in domestic violence with the children present."

Although Mother and Alan had thrown away the boys' tablets, Anthony was able to communicate with Anna for a few days using his Roblox game's messaging function. According to Anna, Anthony wrote in one text message, "Please don't say

20

anything. Don't call me back because my mom will slap me." Anthony also indicated that if Mother found out he had been in contact with Anna, Mother would take away his gaming device and Anthony would be unable to contact them. Anthony did not know where the family was located, and he was not able to give Anna enough information for her to find them.

Anna testified that Mother did not contact her after the boys returned from California in March 2022 or attend hearings in this case for the first few months. Mother's husband, Alan, did not appear for any hearing in this case or at trial. According to Anna, Mother claimed she does not know Alan's whereabouts.

Anna testified that Aaron has court-ordered supervised visitation with Anthony and Adrian, and she supervises the visits and follows the court's orders. According to Anna, Aaron's parental rights should be terminated as to Anthony and Adrian because Aaron, who refused to submit to drug testing in this case, is not doing what he needs to do to properly care for the boys. Anna testified that the boys love Aaron and she will allow him to have contact with the boys if she believes it is in the boys' best interest.

Anna testified that Mother has had telephone contact with Anthony and Adrian, including once in December 2022. The boys are also able to communicate with Mother during their therapy sessions and their therapist is present to supervise. According to Anna, the boys were hurt when Mother did not appear for several of

these court-ordered therapeutic phone sessions with the boys. Anna said that Anthony is happy to talk to Mother when he does talk to her. She said Adrian's interactions with Mother are shorter than Anthony's and Anna attributes this to differences in the boys' personalities.

Anna testified that it was not a good idea for Mother to have the right to know the boys' residence and school because the boys were not safe around Alan, and Anna was worried that Mother would share that information with Alan. Anna testified that it would be better for her to have the ability to withhold that information from Mother if she believed the disclosure of the information would pose a danger to the boys. Anna testified that while Anthony and Adrian loved Mother and they wanted to see her, Anna believed it was in the boys' best interest that Mother's parental rights to them be terminated. Although Anna does not believe Mother should have visitation rights to the boys, she will allow Mother to contact the boys if Mother becomes more reliable. Anna testified that she plans to adopt Anthony and Adrian if Mother's and Aaron's rights to the boys are terminated.

Anna testified that she is in contact with Casey's and Tyler's original foster family, Tanya and Kevin. According to Anna, Casey, Tyler, Pia, and Jayla were placed with Tanya and Kevin after the children returned from California. Tanya and Kevin adopted Casey and Tyler and they intend to adopt Pia and Jayla if Mother's and Alan's parental rights to the girls are terminated. Anna testified that her family

and Tanya's and Kevin's family have grown close. The six children visit together often and are well-bonded to one another.

On cross-examination, Anna testified that she has a brother who was in jail on a charge of assault of a family member, but her brother rarely comes to her home. Anna was unaware that Aaron had two open criminal cases.

### 3. Tanya

Tanya is Jayla's and Pia's foster mother. Tanya, a licensed foster parent, testified that she and her husband Kevin adopted Jayla's and Pia's brothers, Casey and Tyler, in May 2023 after Mother's and Alan's parental rights to the boys were terminated. Tanya and Kevin planned to adopt Jayla and Pia if Mother's and Alan's parental rights to the girls are terminated also.

Casey was removed from Mother's care after Alan allegedly kidnapped him, Anthony, Adrian, and Mother at gunpoint in March 2019. He was twenty months old when he was placed with Tanya's family on December 17, 2019. On March 20, 2020, seven-week-old Tyler, who was born while Casey's case was pending, was placed with Tanya and Kevin.

Tanya testified Casey and Tyler were returned to Mother on November 4, 2021, after Mother testified during a hearing that she and Alan were not together, she claimed she had cut off all contact with Alan, and she did not know where to find him. Casey, who was almost four years old, had been with Tanya and her family

23

for almost two years at that time and Tyler had lived with them for most of his life. Tanya testified that Mother saw Casey and Tyler twice during the two years the boys were living with Tanya's family. Tanya testified that Casey and Tyler were bonded with her and her family, they called her and Kevin "mom" and "dad," and that Tyler, who was nineteen months old, was so upset when he was removed from Tanya's home that the caseworker had difficulty putting him in his car safety seat. Although the Department had planned to place Pia with Tanya and Kevin, they were not able to do so before the court returned the children to Mother in November 2021.[6]

Tanya testified that Casey and Tyler received treatment for medical conditions before they were returned to Mother. Casey, who was diagnosed with hydronephrosis, has one oversized kidney and his normal-sized kidney functions only at about 53 percent. When he lived with Tanya, Casey took daily medication, and he received renal ultrasounds every three months. Casey also drank PediaSure every day to help him obtain a healthy body weight. According to Tanya, Casey ate well but he needed more food than most children his age and he had difficulty keeping weight on. When Casey and Tyler were returned to Mother on November 4, 2021, Casey had already undergone four surgeries to treat his hydronephrosis, and

---

[6]     In November 2021, Mother was five months pregnant with Jayla.

24

he had a doctor's appointment scheduled for later that month to determine whether he needed a fifth surgery.

Tanya, who could not recall the name of Tyler's medical condition, testified that Tyler was given PediaSure daily because he refused to eat solid foods. Tyler had been attending speech therapy weekly for six months to try to promote eating before he was returned to Mother in November 2021.

Tanya gave the caseworker who picked up the boys their doctors' contact information, Casey's medication, and a two-month supply of PediaSure for both boys. According to Tanya, Mother did not refill Casey's prescriptions after he returned to her care or take him to his November 2021 doctor's appointment.

Tanya testified that although she did not have contact with Casey and Tyler after they were removed from her home, Anna spoke to Anthony and Adrian on the phone and Anthony would send photographs of Casey and Tyler to Anna to share with Tanya. Tanya testified that she was concerned about Casey's and Tyler's health when she saw the photographs because the boys "didn't look like themselves. They looked like different children." According to the private investigator hired by Tanya and Kevin, the children stayed at their maternal grandmother's home for a few weeks after they were returned to Mother on November 4, 2021, but the private investigator lost track of the children's location after that.

In January 2022, Tanya learned from Anna that Mother was in jail in California and the children were in CPS custody.[7] In March 2022, Tanya, her husband, and their two daughters drove to California to pick up Casey and Tyler.[8] Tanya testified that when she saw Casey and Tyler in California, the boys were not well-kept and they both "looked like little throwaway kids." According to Tanya, Casey's stomach was so swollen and tender that he "couldn't fit – regular-size clothes." The change in his appearance was so dramatic that it reminded Tanya of "a woman going from having a flat stomach to being pregnant." Casey, who had just turned four years old, looked sad and he did not appear to recognize Tanya and Kevin when he first saw them. Casey told Tanya that he wanted to go home with her and her family. According to Tanya, Casey was in pain the entire drive home to Houston, and she made a doctor's appointment for him while they were enroute so that he could see the doctor the next week.

Tyler, who was two years old, was also in poor health when Tanya saw him in California. He had lost a lot of weight and he had injured his foot after he was removed from her home in November 2021. According to Tanya, it took a couple of months for Tyler's foot to heal.

---

[7]    The records indicate Mother was arrested for child endangerment, but according to Tanya, no charges were filed against Mother.

[8]    Tanya did not specify when they traveled to California, but the record reveals this would have occurred in March 2022.

On August 5, 2022, the trial court issued a final decree terminating Mother's and Alan's parental rights to Casey pursuant to Subsections (D) and (E) and appointing Tanya and Kevin as his joint managing conservators. On August 12, 2022, the trial court issued a final decree terminating Mother's and Alan's parental rights to Tyler pursuant to Subsections (D) and (E) and appointing Tanya and Kevin as his joint managing conservators. In May 2023, Tanya and Kevin adopted Casey and Tyler.

On April 28, 2022, Pia and Jayla were placed with Tanya and Kevin.[9] Pia was fourteen months old, and Jayla was six or seven weeks old. According to Tanya, Jayla is developmentally on target and doing well. Pia, however, was developmentally delayed and had behavioral and emotional problems. According to Tanya, Pia was angry, prone to outbursts, banged her head on the floor, and it took a while for her to calm down after each outburst. Tanya testified that it took six months before Pia's behavior began to improve. In addition to her behavioral problems, Pia was non-verbal and delayed in every area for a child her age when she was placed in Tanya's home. While living with Tanya, Pia began working with a speech therapist, an occupational therapist, and a developmental therapist. Tanya testified that by the time of trial, Pia had made a lot of progress and could say three

---

[9] After Mother was arrested in California in January 2022 for child endangerment, Pia and Jayla were in a foster home in California for two months and a foster home in Texas for one month before they were placed with Kevin and Tanya.

words. Pia had been recently tested for autism and although it was too soon for an official diagnosis, the person who tested Pia believed she is autistic. Tanya, who had already paid out of pocket from some of the children's medical treatment, testified that once Pia has been officially diagnosed with autism, she will need "between 35 and 40 hours a week" of treatment that Medicaid will not cover.

Tanya testified that Pia, Jayla, Casey, and Tyler are very bonded to one another, and they treat each other as if they have always been together. The four children also have a relationship with their older brothers, Anthony and Adrian. Tanya testified that she and Kevin have become close to Anna, and they consider each other family. Casey and Tyler regularly visited with Anthony and Adrian before the children were returned to Mother in November 2021, and the six children regularly visited with one another after they were returned to Anna's and Tanya's care in March 2022. According to Tanya, she and her family had been to Anna's home probably ten times, including twice for birthday parties. Tanya testified that she did not know that Anna had a brother and the only other male she had seen at Anna's home was Anna's son, Aaron, who had attended the birthday parties.

On cross-examination, Tanya testified that Aaron was present for the two birthday parties she attended at Anna's home. Tanya did not know that Aaron had a criminal record. When asked if she had an opinion regarding whether Anna was protective of Anthony and Adrian, Tanya testified Anna was "very protective" and

she was "careful about who they're around for safety reasons." Tanya testified that Anna's home "reminds me of the neighborhood home where all the kids like to be." According to Tanya, there was "usually a lot of people around" when she visited Anna's home. When asked if Anna allowed Anthony and Adrian to be alone with Aaron, Tanya testified Anna told her that Aaron could not be left unsupervised with Anthony and Adrian, and Tanya had never seen Aaron alone with the boys.

Tanya has sent Mother forty-five photographs of the children and she planned to continue to send Mother photographs of the children two to three times a year. She was also creating a photo book of the children for Mother.

### 4. Deputy William Parker

On March 21, 2023, Deputy William Parker with the Harris County Sheriff's Office was dispatched to a family disturbance at Julie's residence. Julie and Mother's sisters told Deputy Parker that Mother's husband, Alan, was abusing her in a bedroom and refusing to let her leave. They told Deputy Parker that Alan had been threatening family members and they heard Mother crying and "pleading with [Alan] to let her out of the room and let her out of the closet." According to Deputy Parker, Julie and Mother's sisters appeared to be afraid of Alan.

After announcing himself at the door, Deputy Parker asked Mother to step out of the bedroom. Mother, who was agitated and combative towards the officers, told Deputy Parker she did not need help and she denied that Alan was with her.

Although Deputy Parker told Mother they would leave after he verified that she was okay, Mother still refused to open the bedroom door. Deputy Parker asked Mother's family members for more information about Alan, and he asked Julie for permission to enter the room forcibly if Mother continued to refuse to open the door.

When Mother refused again to open the bedroom door, Deputy Parker kicked the door open, and the officers escorted Mother out of the room. According to Deputy Parker, Mother was irate, aggressive, and angry. Although Mother continued to deny that Alan was in the bedroom, Deputy Parker found Alan hiding behind a large suitcase in the bedroom closet. When he was initially detained by the officers, Alan gave the officers a fictitious name. Alan was arrested for failure to provide his identification, violation of bond conditions, and an outstanding warrant.

Deputy Parker testified Mother, who continued to be combative and uncooperative after she left the bedroom, was angry with her family members for calling the police and she was angry with the police for arresting Alan. According to Deputy Parker, Mother got into her car and left Julie's home. Deputy Parker testified that he saw one child present in the home, and it was reported that other children were also present. According to Deputy Parker, exposure to this type of scene is traumatizing for children and has a long-lasting effect.

### 5. Sergeant Courtney Reyes

Sergeant Courtney Reyes with the Harris County Constable's Office testified that early in 2022, he was dispatched to a suspicious person call. When he arrived, Sergeant Reyes saw a black male with a backpack standing near a vacant home. The man, who was later identified as Alan, told Sergeant Reyes he was there to visit a two-day-old child down the street. After running Alan's criminal history, Sergeant Reyes learned Mother had a protective order against Alan arising from a charge of assault of a pregnant person. After speaking to Mother, the officers learned that Alan, who had Mother's debit cards in his possession, had visited his newborn daughter Jayla in Mother's home and charged his phone while there. Alan, who was not supposed to be within 200 feet of Mother, was arrested for violating his bond conditions and the protective order. According to Sergeant Reyes, Mother did not express any concern over Alan's presence in her home or ask the officers to arrest Alan.

### 6. Mother

Mother, the biological parent of Jayla, Pia, Anthony, and Adrian, testified that although she was still married to Alan, she had completed the paperwork to file for divorce. Mother's and Alan's marriage license reflects that they were married on October 14, 2019.

Mother testified that she had not seen Alan since March 21, 2023, the day he came to see Mother at her aunt's home at 410 West Bellfort Avenue. According to Mother, someone called the police and Alan was arrested that day for violating the protective order Mother had taken out against him.

On direct examination, Mother denied that the police came to Julie's home on March 21, 2023 to check on Mother's safety after Alan abused her and refused to let her leave the bedroom. Mother denied that she and Alan were in the bedroom when the police knocked on the door to check on her and she denied telling the officers to leave her alone and that she was fine. Mother also denied that the officers found Alan hiding in the closet after they entered the bedroom. After Mother's direct testimony concluded, the trial court allowed Sergeant Reyes and Deputy Parker to testify. On cross-examination, Mother admitted that Deputy Parker's testimony regarding the March 21, 2023 incident was truthful. Mother testified that she had not testified truthfully about the incident because she was ashamed, and she did not want everyone to know.

Mother explained that Alan had been angry with her family for "ruining his life—for putting him on the news with that Amber alert" and humiliating him in front of his family and friends and he threatened that Mother, and her family were "going to pay for it." Mother explained that she was angry with her family for calling

32

the police after Alan refused to allow her to leave the bedroom because she believed that if they did not "say anything else about him, maybe he'll leave us alone."

Mother acknowledged that when she testified during a January 2023 hearing, she told the court that she had not seen Alan since they were arrested in California in January 2022. She admitted, however, that she saw Alan in February 2022 when he was arrested for violating a protective order after he tried to visit Mother and Jayla at Julie's home. Mother had obtained the protective order against Alan after he was arrested on July 17, 2021 for assaulting her when she was pregnant with Jayla. Mother explained that she deliberately misled the court during the January 2023 hearing about her contact with Alan because Alan had repeatedly threatened her life if she "told anybody where he was or anything else about him." She also testified that she asked for the assault charge against Alan to be dismissed because Alan had been threatening her and her family.

At trial, Mother testified that she felt she was safe from Alan because she was not in contact with him, and he had not tried to reach out to her. When asked if she would feel safer if Alan was in jail, Mother said that she would feel safer and she "wish[ed] they would put him in jail." When asked why she requested that the assault charge against him be dropped if she felt safer when Alan was in jail, Mother testified, "I told you why. Can we move on?"

Mother agreed that she stayed in a relationship with Alan after he held a gun on her and the children until the end of 2020. Although she denied reuniting with Alan, Mother admitted that she traveled with him to California. She also admitted that her youngest daughter with Alan, Jayla, was born in February 2022. Mother explained that she and Alan had sex with one another, but they were not in a relationship. Mother later denied that Alan used a gun when he took her and the children from Julie's home in 2019.

When questioned about the trip to California and the circumstances surrounding her arrest for child endangerment, Mother testified that she took the children to a motel after Julie's house lost power and Alan stopped by their room. Mother allowed Alan to come inside the hotel to shower and grab a bite to eat, and when she told Alan that he had to leave, Alan refused. Mother testified that Alan, who was carrying a gun, cut off his ankle monitor and told her the police would be looking for him and that she and the children needed to go with him. After he made Mother and children get rid of their phones and electronics, Alan arranged for someone to drive the family to a house in Brookshire, where they stayed for a few days before getting a ride to Arizona. The family, who stayed in a motel in Arizona, was "running out of the money" and did not have food. A Good Samaritan gave the family money and paid for their bus tickets to California, where Mother's aunt lived.

Mother testified that she and Alan took the kids to the beach one day and then took a rideshare to Pasadena, California where they walked around looking for another motel. According to Mother it began to get dark, and she and kids were tired of walking around, so they stopped to rest at a bus stop. When Mother told Alan that she wanted to go home, Alan told her they were not going anywhere. Alan then crossed the street to speak to someone, and he returned to Mother with some cash. Mother told him to call a Lyft.

Mother testified that while Alan had a gun, he did not threaten her with it or kidnap her and the children at gunpoint and take them to California. She insisted, however, that she traveled to California with Alan against her will.

When asked about the contents of the Pasadena Police Department's offense report, which was admitted into evidence as Petitioner's Exhibit 105, Mother denied that she was hostile to the police when they approached her, she said the police never asked her if she wanted help, and she denied telling the police that she did not want help. Mother explained that she told the police to leave her alone because they were aggressive with her for no reason.

Mother also denied large portions of the statement she gave to the police, which was included in the report. She denied that she told the police that she was in California because she was planning to stay with an aunt in Los Angeles, for whom she did not have a contact number. Mother denied saying that her family was

traveling from Texas to Los Angeles, California and was dropped off by a truck coming from Arizona, and she denied telling the police that, after arriving in Los Angeles, she discovered that staying with her aunt was not an option. Mother also denied telling the police that her plan was to take the children back to Arizona to find a place to stay.

Mother denied saying that the family was low on money and trying to get money from drivers coming off the freeway. She denied being agitated when speaking with the police. She denied that Anthony lost his shoes while they were walking. When asked if she told the police that she was a hostage of Alan and if she asked for help, Mother said that she did not tell the police anything. She also denied that the family hitchhiked to get to California or slept under bridges, and she said the only time the kids rested outside was when they were sitting on park benches. Mother also denied telling the evaluator who conducted her psychological assessment that she was in California on vacation with her husband and children and she denied telling the person completing her substance abuse assessment that she was visiting California because her family might want to move there.

Mother said she did not follow up on Casey's medications because she did not have his physician's contact information. Mother later testified that she had attempted to take Casey to the doctor, but she did not follow up with them after they told her she needed to address an issue with Medicaid and take him to a specialist.

36

She also testified that Casey had been seeing a specialist at Texas Children's before the Department removed him from her care. Mother did not try to contact the specialist after Casey was returned to her in November 2021. She testified that she did not know that Casey was in pain if he did not get his medication.

When asked why she waited until January 2023 to begin services, Mother blamed her late start on the Department and the service provider for delaying her therapy. When asked why she waited to submit to a substance abuse assessment, Mother said that "y'all didn't give me the information to do all of these things."

Regarding her delay in scheduling and submitting to a psychological assessment, Mother said that she did not know who to call, despite acknowledging that her attorney was making calls with her. Mother testified that she did not recall scheduling a psychological evaluation or a psychiatric evaluation, failing to appear for either of those appointments, or canceling many of her therapy appointments. She also did not recall canceling therapy appointments and claiming that they conflicted with visitations with her children.

Although she testified that she did not recall failing to appear for visitations, she admitted to missing three visits with Adrian and Anthony while under court order to visit them while supervised by a therapist. Mother stated that she missed those visits because her mental health was not good, and she did she did not want the boys to see her in that condition.

37

She also did not recall reviewing her services with the caseworker at a family group conference meeting in September 2022 or whether her services were reviewed at her court appearance in September 2022. Mother testified that she did not attend therapy or do any of her services in the previous case because Alan would not let her do it and she "wasn't ready to open up and deal with that trauma."

Mother was also asked about the children's current placements. When asked if Anthony and Adrian were being well-cared for by Anna, Mother testified that she believed Anna was "doing a good job." According to Mother, she and Anna initially had a "very good relationship," but she does not know how Anna feels about her now. Mother testified that it hurt her to hear that Anthony and Adrian wanted to live with Anna, but she knew the boys had been through a lot, she loved them, and she respected their decision. "So if that's where they want to stay, then I'll let them stay there." Mother testified she sent money to Anna to provide for Anthony and Adrian while they were in Anna's home. She had also spoken on the phone to Anthony and Adrian. Mother felt that she and Aaron had a good relationship, and they could communicate with one another regarding Anthony and Adrian's parenting.

Mother testified she is not in contact with Tanya and Kevin, but based on the photographs Tanya sent her, Pia and Jayla appeared to be doing well in their home. Mother agreed that she met with Tanya and that Tanya had answered her questions about the girls. Mother was concerned that Pia was possibly autistic and

experiencing difficulty with her vision and hearing, but she believed Tanya and Kevin were doing their best to get Pia the care she needed.

Although she understood why the Department believed the children were not safe around Alan and why they were concerned that she had not been honest about her contacts with Alan, Mother testified that she would never put her children in danger or allow Alan to harm them. Mother acknowledged, however, that after the children were returned to her care in November 2021, she remained in contact with Alan, and she put her children in danger. Mother agreed that her continued contact with Alan posed a danger to her children.

When asked if she understood the Department's concern that allowing her to retain her parental rights and know where the children lived and where they attended school would pose a danger to the children because of her contacts with Alan, Mother testified, "No. I don't. I feel like you have no right to try to make me feel like I have no right—a chance to be a mother because of a mistake that I made because of something I went through that I didn't ask for. I feel like you have no right."

Mother testified that she was receiving individual therapy to help her develop "coping skills for PTSD due to my domestic violence" and therapy was helping her start to take accountability and recognize the mistakes she had made as a parent. She

also testified about the physical and emotional abuse she had suffered at the hands of Alan.

When asked how she was going to protect her children if they were returned to her care, Mother testified that she was going to get a protective order against Alan and she would send the children to Anna's home if she thought they were in any danger from him. When asked how the children would be safe with Anna, Mother testified that Alan "doesn't know where they are [and she was] pretty sure [Anna is] not going to let him come around them, and I'm not going to tell him where they are."

With regard to her future plans, Mother testified that the first thing she needed to do was make sure that she was being honest, and she needed to continue attending therapy and acquire stable housing and employment. Mother testified that Julie was helping her out financially because Mother was a full-time college student and studying to be a paralegal. Mother explained that she was trying to divorce Alan, but she had not been able to serve him with papers because he was homeless, and she did not know where to find him. Mother also testified that although she had not seen Alan since he was arrested in March 2023, he had been threatening her and stalking her on social media. She said she wanted Alan to be in jail so that he would stop harassing her and leave her family alone and not pose a danger to her or her children. She also wanted to "build a relationship" with Anna.

40

Mother testified that she was not a "bad person," but rather a victim of domestic abuse who was healing through therapy. She testified that she loved her children and she wanted to be part of their lives and see them grow up. Mother testified that she took "full responsibility" for the mistakes she had made with her children. Mother testified that Anthony and Adrian love her, and she knows the younger children love her as well. According to Mother, the children would benefit from being around her because "they can actually have their mom around and see the healthy and stable life without just seeing drama." Mother testified,

> I want them to know that there's a world where they can have their mom in a healthy environment where they can have love and feel safe. I want them to know that, and I want them to experience—I feel like they deserve to have their mom around in a healthy environment where they see love. And they feel loved. And they don't have to feel scared. I feel like they deserve to have that. They don't deserve to be put in the situations they were put in. They never deserved that.

Mother admitted that her children had been removed from her care in 2019 and during that case, she had also testified that she was suffering from battered women's syndrome, she was no longer in contact with Alan, and she was going to focus on healing herself.

## B. Closing Arguments

In its closing, the Department argued that Mother's parental rights to Anthony, Adrian, Jayla, and Pia should be terminated under Section 161.001(b)(1)(D) and (E), which address child endangerment, because Mother knowingly placed or allowed

41

the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being and she engaged in contact or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). In addition to endangerment grounds, the Department argued that Mother's parental rights to the children should also be terminated under Section 161.001(b)(1)(M), (N), and (O) because (1) it was undisputed that Mother's parental rights to Casey and Tyler were terminated on endangerment grounds, (2) Mother constructively abandoned Jayla and Pia, and (3) Mother, who did not begin participating in the services required by her FSP until two weeks before the first trial setting, failed to complete her services prior to trial. *See* TEX. FAM. CODE § 161.001(b)(1)(M), (N), and (O).[10]

The Department argued it was in the children's best interest for Mother's rights to be terminated because the children were thriving in their current placements and Mother had remained in contact with Alan after the children were returned to her care in November 2021, even though she had previously told the court on multiple occasions that she had cut off contact with Alan.

---

[10] The Department argued that Aaron's parental rights to Anthony and Adrian should be terminated under Subsections (D) and (E), and Alan's parental rights to Jayla and Pia should be terminated under Subsections (D), (E), (M), (N), and (O). Alan did not participate in the case and neither Alan nor Aaron are appealing the trial court's termination of their parental rights.

With regard to Anthony and Adrian, the Department argued the boys were doing well in Anna's care and Anna would allow the boys to have contact with Mother if Anna believed it was safe to do so. According to the Department, it was in the boys' best interest for them to live with Anna because they were safe and doing well in her home. The Department argued Mother should not have the right to know where the boys live or go to school because the boys had been "kidnapped or forced to go" with Alan twice, and there was a danger that Mother would share information regarding the boys' location with Alan. The Department also argued that Mother should not have the right to visit the boys because she did not show up for court-ordered visits. The Department asked the trial court to terminate Mother's and Aaron's parental rights to Anthony and Adrian and to appoint the Department as the boys' permanent managing conservator to allow Anna to adopt Anthony and Adrian.

With regard to Jayla and Pia, the Department argued the girls were doing well with Tanya and Kevin, they were receiving the therapies they needed, they had no memory of Mother, and they were bonded with Tanya and Kevin and their biological brothers, Casey and Tyler, who had already been adopted by Tanya and Kevin. The Department asked the trial court to terminate Mother's and Alan's parental rights to Pia and Jayla and to appoint the Department as the girls' permanent managing conservator to allow Tanya and Kevin to adopt Pia and Jayla.

In her closing argument, Mother argued it was not in Anthony's and Adrian's best interests that her rights be terminated because the boys know her and love her, she is a loving and involved parent, and the boys were reuniting with Mother through their therapy and working on their relationship with her. Mother argued that she and Anna believe they can continue to have a good relationship. Responding to the Department' argument that it was dangerous for her to have the right to know where the boys lived and attended school, Mother argued that she already had that information and she had not "done anything" or "violated the rules of the court order."

With regard to Aaron, Mother argued that he had "a few things that he needs to clean up like two criminal records," but Aaron had remained involved in the boys' lives, the boys were living with his mother Anna, and "things are going well."

Mother argued that although it might not be the "best situation," the boys were entitled to "have a mother and a father who want to remain in their life and have been in their life." She argued that she and the boys could continue in therapy and although Aaron "needs to take care of his business," he is going to remain in the boys' lives on a consistent basis because the boys will be with his mother, Anna. Mother further stated,

> So maybe there are grounds for termination, but it's not in the children's best interests. They are fortunate that they have two healthy parents who love them and who are involved in their life. And it would not be in their best interests to throw that away. It would probably -- when this

44

case is over and hopefully the restriction of no contact with the mom is removed and in some way expanded, that—to be able to grow up a more normal life with a mom and a dad is in the best interests and it will work. And these parents are good partners. They have their problems as adults, but as parents, they—they're involved. They're caring. They're loving.

With regard to Jayla and Pia, Mother argued it was in the girls' best interest to know who their mother was because it was going to happen anyway. She argued that Kevin and Tanya had begun communicating with her, or at least keeping her informed, and sharing pictures of the girls and "that's a really good thing that that's happening." Mother agreed that it was in the girls' best interest that Alan's parental rights be terminated. Mother concluded by saying,

> So we're asking the Court to take into consideration on [Anthony and Adrian] to maintain the parental relationship and not terminate it. Perhaps restrict it or put guidelines in it or make orders for it, but keep —do not terminate [Mother's and Aaron's rights to the boys.]

The children's attorney ad litem told the court that Anthony is "a mama's boy," and "every time I have met with him, he has expressed to me, unequivocally, how much he adores his mother." Regardless of his love for Mother, Anthony wanted to live with Anna, not Mother. Adrian, who was "nonchalant" and a "pretty easy going" kid," wanted Anna to adopt him.

The attorney ad litem then discussed some of the factors set forth in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976), which courts consider when evaluating

45

whether a given decision is in the child's best interest.[11]  With regard to the children's desires, the attorney ad litem told the court that although Adrian wanted to be adopted by Anna, he seemed "ambivalent regarding a relationship" with Mother. According to the ad litem, Adrian wants to stay in contact with Aaron and he wants to have "phone contact, video contact, and probably some type of physical contact in the future with [Mother], if possible."

The attorney ad litem argued that Anna was a wonderful, protective caregiver for the boys, Anna would allow Mother and Aaron to see the boys "as long as it is appropriate," and after working with Anna since the first case began in 2019, the ad litem trusted Anna's judgment.  She stated,

> So I'm conflicted. One kid is saying: I want to be adopted. One kid is basically saying: I want PMC.
>
> I honestly—with regards to both of those kids—do not think it makes a difference because as long as the Court puts in parameters that [Anna] has the—all the rights and duties of a parent and that neither the father nor the mother have any rights, that supervision—that visitation be mutually agreed and that [Anna] decide what that visitation looks like

---

[11]     In *Holley v. Adams*, which we address later in this opinion, the Texas Supreme Court identified a list of non-exclusive factors that courts should consider when evaluating whether it is in the child's best interest to terminate their parents' rights.  544 S.W.2d 367 (Tex. 1976). The *Holley* factors also apply when assessing whether conservatorship decisions are in the children's best interest. *See V. M. v. Tex. Dep't of Family & Protective Services*, 681 S.W.3d 465, 474 (Tex. App.—Austin 2023, no pet.) ("Just as in a termination determination, best interest determinations in the conservatorship context are reviewed in connection with the non-exhaustive factors set out in *Holley v. Adams*, 544 S.W.2d 367 (Tex. 1976).").

The children's attorney ad litem did not address whether the predicate findings for termination were met with regard to Mother or Aaron.

46

and when it looks like. She is already a licensed foster parent. She is receiving [Permanency Care Assistance] benefits. So any benefits that she would receive via adoption, she's already going to get via—even if the Court chooses PMC.

The attorney ad litem also expressed concern about how going through the adoption process "would emotionally affect" Adrian.

With regard to Pia and Jayla, the ad litem argued that it was in the girls' best interest to terminate Mother's and Alan's rights based on several of the *Holley* factors. According to the ad litem, it was in the girls' best interests to terminate Mother's parental rights because the children had gone through "tremendous traumatic experiences," and based on Mother's prior conduct, "they likely will continue to do so" if Mother remains in their lives. The ad litem further argued that Mother does not have the "mental space, physical space, financial space to even address" Pia's substantial physical needs, a stable home, or a job. Mother also had not completed therapy, demonstrated she was able to parent the girls, or complied with her FSP. The ad litem stressed that while Mother claimed that one of the first things she would do was to get a restraining order against Alan, "that should have been applied for and received a long time ago."[12]

After hearing closing arguments from the other parties, the Department argued that if the court appointed Anna as Anthony's and Adrian's sole managing

---

[12] Aaron's attorney argued in closing that Aaron's rights should not be terminated.

conservator and Mother and Aaron as their possessory conservators, the court should not give Mother the right to know where the boys lived, where they attended school, or who their medical providers were because allowing Mother to have that information posed a danger to the boys.

On August 3, 2023, the trial court reopened the evidence at the Department's request to allow Johnson to testify regarding the availability of Permanency Care Assistance ("PCA") benefits to Anthony and Adrian. The Department explained that PCA benefits are "benefits that are paid to assist families to care for children that have been through the CPS system." Johnson testified that when the evidence closed in Anthony's and Adrian's case, CPS had only finalized a benefits package for the boys if the court decided to terminate the parents' rights and appoint the Department as PMC. CPS, however, had not finalized a benefits package for the boys if, instead of terminating the parents' rights, the court appointed Anna as the boys' sole managing conservator and the parents as possessory conservators. Johnson testified that CPS had now finalized a benefits package for the boys for either scenario, and thus Anthony and Adrian would receive PCA benefits regardless of whether the trial court terminated the parents' rights and appointed the Department as PMC, or appointed Anna as the boys' sole managing conservator and the parents as possessory conservators.

## C.    Trial Court's Ruling

On September 1, 2023, the trial court signed a final decree in cause number 2017-13719 terminating Mother's and Alan's parental rights to Jayla and Pia pursuant to Sections 161.001(b)(1)(D), (E), (M), (N), and (O) of the Texas Family Code, and naming the Department as Jayla's and Pia's sole managing conservator. On the same day, the trial court issued an "Order Modifying Prior Order" in trial court cause number 2017-45835 removing Mother and Aaron as Anthony's and Adrian's managing conservators, appointing Anna as their sole managing conservator, and naming Mother and Aaron as possessory conservators.

Mother filed timely appeals from the final decree terminating her parental rights to Jayla and Pia and the order removing her as Anthony's and Adrian's managing conservator.

## Termination of Mother's Parental Rights to Jayla and Pia

In her first five issues, Mother argues there is legally and factually insufficient evidence supporting the trial court's findings she (1) committed the predicate acts under Sections 161.001(b)(1)(D), (E), (M), (N), and (O), and (2) that termination of her parental rights is in Jayla's and Pia's best interest.  *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (M), (N), (O), and (b)(2).

## A. Standard of Review

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (quoting *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 27 (1981)); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted); *see also In re R.J.G.*, 681 S.W.3d 370, 373 (Tex. 2023) ("Both this Court and the Supreme Court of the United States have long recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children."). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick*, 685 S.W.2d at 20.

In a case to terminate parental rights under Texas Family Code Section 161.001, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated predicate acts or omissions

justifying termination and (2) termination is in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

When reviewing the legal sufficiency of the evidence in a case involving termination of parental rights, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that there existed grounds for termination under Section 161.001(b)(1) and that termination was in the best interest of the child. *See* TEX. FAM. CODE § 161.001(b)(1), (2); *In re J.F.C.*, 96 S.W.3d at 266. We examine all evidence in the light most favorable to the finding, assuming the "factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *In re J.F.C.*, 96 S.W.3d at 266. We must also disregard all evidence that the factfinder could have reasonably disbelieved or found not to be credible. *Id.* But this does not mean we must disregard all evidence that does not support the finding. *Id.* Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that

51

evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

When conducing a factual sufficiency review in a termination case, we must consider the entire record. *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020); *In re J.F.C.*, 96 S.W.3d at 266. We assume "that the factfinder resolved disputed evidence in favor of the finding if a reasonable factfinder could do so." *In re Commitment of Stoddard*, 619 S.W.3d at 674 (citing *In re J.F.C.*, 96 S.W.3d at 266). Unlike a legal sufficiency review, when assessing the factual sufficiency of the evidence we cannot disregard disputed evidence that a reasonable factfinder could not have credited in favor of the finding. *In re Commitment of Stoddard*, 619 S.W.3d at 674 (citing *In re J.F.C.*, 96 S.W.3d at 266); *see also In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018) ("The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered."). Rather, we must determine whether, in light of the entire record, that evidence "is so significant that a factfinder could not reasonably have formed a firm belief or conviction" that the finding was true. *In re Commitment of Stoddard*, 619 S.W.3d at 674 (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under both legal and factual sufficiency standards, the trial court is the sole arbiter of a witness' credibility and

demeanor and the weight of the evidence.  *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## B.     Predicate Findings

In her first five issues, Mother argues there is legally and factually insufficient evidence supporting the trial court's findings she committed the predicate acts under Subsections (D), (E), (M), (N), and (O).  *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E), (M), (N), and (O).

Under Section 161.001(b)(1)(M), a parent's rights may be terminated if clear and convincing evidence establishes the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state."   TEX. FAM. CODE § 161.001(b)(1)(M). Mother agues there is a "complete absence of any evidence necessary to support the Department's request to terminate [her rights to Jayla and Pia] pursuant to § 161.001(b)(1)(M)."

On the contrary, the prior August 5, 2022 decree terminating Mother's parental rights to Casey and the prior August 12, 2022 decree terminating Mother's parental rights to Tyler were admitted into evidence at trial and both decrees state that Mother's parental rights were terminated on grounds of endangerment.  *See* TEX. FAM. CODE § 161.001(b)(1)(D) & (E).  This undisputed evidence, standing alone, is

53

legally and factually sufficient as a matter of law to support the trial court's finding that Mother engaged in the predicate ground for the termination of her rights as to Jayla and Pia under Section 161.001(b)(1)(M). *See In re C.M.J.*, 573 S.W.3d 404, 411 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (stating "evidence of a prior decree reflecting the requisite findings under subsection (D) or (E) satisfies the Department's burden under subsection (M)") (citing *In re A.C.*, 394 S.W.3d 633, 641 (Tex. App.—Houston [1st Dist.] 2012, no pet.)); *In re A.R.*, No. 01-21-00263-CV, 2021 WL 4780081, at *4 (Tex. App.—Houston [1st Dist.] Oct. 14, 2021, pet. denied) (mem. op.) (stating that "standing alone, the prior termination of the [parent's] rights as to another child constitutes legally and factually sufficient evidence of a predicate ground for the termination of the [parent's] parental rights as to A.R. as a matter of law"). Only one predicate finding under Section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d at 362.

The trial court also found that Mother's rights to Pia and Jayla should be terminated because Mother endangered the children by knowingly placing or allowing the children to remain in conditions or surroundings which endangered their physical or emotional well-being and engaging in conduct or knowingly placing the children with persons who engaged in conduct which endangered their

physical or emotional well-being. *See* TEX. FAM. CODE § 161.001(b)(1)(D), (E). In most cases, when the trial court makes endangerment findings such as these, appellate courts must evaluate the sufficiency of the evidence supporting the endangerment findings even if another predicate act or omission supports the trial court's decree because of the collateral consequences of endangerment findings. *See In re N.G.*, 577 S.W.3d 230, 234–37 (Tex. 2019) (stating when parent's rights have been terminated under either section 161.001(b)(1)(D) or (E) "that ground becomes a basis to terminate that parent's rights to other children" under Section 161.001(b)(1)(M) and holding allowing such endangerment findings "to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights"). We need not address the trial court's endangerment findings in this case, however, because the present findings do not impose any collateral consequences on Mother to which she was not already subject to given the prior decrees issued in 2022 terminating her parental rights to Casey and Tyler in 2022 on endangerment grounds. *See In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at *6 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.) (holding there was sufficient evidence supporting trial court's finding under Section 161.001(b)(1)(M) and although trial court also made endangerment findings in current case, appellate court did not need to address

55

those most recent endangerment findings because findings did not impose any additional collateral consequences).

We overrule Mother's first, second, third, fourth, and fifth issues.

## C. Best Interest of the Child

In her second issue, Mother argues there is legally and factually insufficient evidence supporting the trial court's finding that termination of her parental rights was in Jayla's and Pia's best interest. *See* TEX. FAM. CODE § 161.001(b)(2).

### 1. Applicable Law

The purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct. *See In re A.V.*, 113 S.W.3d at 361. There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). But there is also a presumption that the "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE § 263.307(a); *see also In re B.J.C.*, 495 S.W.3d 29, 39 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (noting child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination).

To determine whether parental termination is in a child's best interest, courts may consider the following non-exclusive factors: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors are not exhaustive, and evidence is not required on every factor to support a finding that termination of parental rights is in the child's best interest. *Id.*; *In re D.R.A.*, 374 S.W.3d at 533. Courts may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as direct evidence when conducting a best-interest analysis. *See In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied).

We may also consider the statutory factors set forth in Texas Family Code Section 263.307, including: (1) the child's age and physical and mental vulnerabilities; (2) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (3) the willingness and

ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (4) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (5) whether the child's family demonstrates adequate parenting skills, including providing the child with minimally adequate health and nutritional care, a safe physical home environment, and an understanding of the child's needs and capabilities; and (6) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b); *In re R.R.*, 209 S.W.3d at 116.

A parent's past conduct is probative of his future conduct when evaluating the child's best interest. *See In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.); *see also Jordan v. Dossey*, 325 S.W.3d 700, 724 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A factfinder may also infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent when assessing the best interest of the child. *See In re D.M.*, 452 S.W.3d 462, 471 (Tex. App.—San Antonio 2014, no pet.).

Evidence supporting termination under one of the predicate grounds listed in Section 161.001(b)(1) may also be considered in support of a finding that termination is in the best interest of the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (stating finding under Section 161.001(b)(1)(O) can support best

interest finding); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

## 2. Briefing Waiver

Our rules of appellate procedure have specific requirements for briefing, including briefing in appeals from final decrees terminating a parent's parental rights to their child. *See* TEX. R. APP. P. 38.1(f), (h), (i); *see also In re D.J.W.*, 394 S.W.3d 210, 223 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (applying Rule 38.1's briefing requirements to appeal from termination of parental rights); *see also In re L.E.R.*, 650 S.W.3d 771, 788–89 (Tex. App.—Houston [14th Dist.] 2022, no pet.) (same). These rules require an appellant, among other things, to state concisely her complaint, provide succinct and clear argument for why her complaint has merit in fact and in law, and cite and apply authorities applicable to the lodged complaint along with appropriate record references. *See* TEX. R. APP. P. 38.1(f), (h), (i). We are not responsible for identifying possible trial court error, searching the record for facts favorable to a party's position, or conducting legal research to support a party's contentions. *See Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 283–84 (Tex. 1994); *Canton-Carter v. Baylor Coll. of Medicine*, 271 S.W.3d 928, 931 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Were we to engage in such activities, we would be abandoning our role as judges and taking on the role of advocate for that party. *See Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El

Paso 2007, no pet.). An appellate issue that is not supported by argument or that contains an argument without citation to the record or legal authority presents nothing for review. *In re L.E.R.*, 650 S.W.3d at 788; *see also In re J.A.M.R.*, 303 S.W.3d 422, 425 (Tex. App.—Dallas 2010, no pet.) ("Bare assertions of error without argument or authority waive error."); *see also In re K.C.B.*, 280 S.W.3d 888, 896 (Tex. App.—Amarillo 2009, pet. denied) (holding parent waived sufficiency complaint in parental termination case due to inadequate briefing).

After setting forth the appropriate standard of review and applicable legal authority, Mother concludes by stating: "A lack of evidence does not constitute clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d at 808." This is the totality of Mother's best interest argument. She does not identify any evidence supporting her legal or factual sufficiency challenges, cite to the record, or offer a meaningful legal analysis with regard to either challenge. By failing to adequately brief her challenge to the sufficiency of the evidence supporting the trial court's finding that termination of her parental rights was in Pia's and Jayla's best interest, Mother has waived these issues for appellate review. *See* TEX. R. APP. P. 38.1(i); *In re D.J.W.*, 394 S.W.3d at 223 (holding mother waived challenge to sufficiency of evidence supporting best interest finding in parental termination case because her brief "contain[ed] no legal argument in support of these points"); *see also In re L.E.R.*, 650 S.W.3d at 789 (holding mother's challenges to sufficiency of evidence supporting best interest

60

finding were waived when brief, which contained conclusory and bare assertions, failed to provide any substantive analysis of evidence, or appropriate citations to record); *In re J.A.M.R.*, 303 S.W.3d at 425 ("Bare assertions of error without argument or authority waive error.").

### 3. Analysis

Even if Mother had not waived her challenges to the sufficiency of evidence supporting the trial court's finding that termination of her parental rights was in Pia's and Jayla's best interest, Mother would not prevail on appeal.

Multiple factors support the trial court's finding that termination of Mother's parental rights was in Jayla's and Pia's best interest, the first of which is Mother's history of endangering her children, including her inability to protect them from Alan.[13]

The record reflects that Alan is a violent, dangerous, and controlling person who has physically and emotionally abused Mother and at least some of the children.

---

[13] Because there was clear and convincing evidence supporting the trial court's finding under Section 161.001(b)(1)(M), it was not necessary for us to decide whether there was also sufficient evidence supporting the trial court's findings that Mother had engaged in endangering conduct under Section 161.001(b)(1)(D) and (E). *See In re R.S.*, No. 01-20-00126-CV, 2020 WL 4289978, at *6 (Tex. App.—Houston [1st Dist.] July 28, 2020, no pet.) (mem. op.). Evidence supporting the trial court's findings under Section 161.001(b)(1)(D) and (E), however, is nevertheless probative of whether termination of Mother's parental rights was in Jayla's and Pia's best interest. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002) (holding same evidence may be probative of both Section 161.001(b)(1) grounds and best interest).

Anthony, Adrian, and Casey were initially taken into care in March 2019 after Alan kidnapped Mother and the children at gunpoint. Rather than distancing herself from Alan, Mother carried on a relationship with him until the end of 2020. She also had three more children with Alan during and after this time: Tyler, who was born in February 2020, Pia, who was born in January 2021, and Jayla, who was born in February 2022. Tyler, Pia, and Jayla, who were all born while their older siblings were in the Department's care, were also removed from Mother's care, and placed in a foster home. At trial, Mother denied that she reunited with Alan after the end of 2020 and testified that she and Alan had a sexual relationship, not a romantic relationship.

After the court returned Anthony, Adrian, Casey, and Tyler to Mother on November 4, 2021, Mother withdrew Anthony and Adrian from school, cut Anthony and Adrian off from Anna and the rest of their extended family, and took all five children to California with Alan. According to Anthony, the family hitchhiked and walked part of the trip to California, and they slept in abandoned buildings, under bridges, and under freeways. Anthony, who turned nine years old in November 2021, claimed that Mother and Alan often left him alone and in charge of the four younger children. He also told his therapist that Alan abused him and the other children and, on one occasion during their trip, Alan carjacked a woman and forced Anthony to shoot her.

62

On January 14, 2022, the children were removed from Mother's care after the police found Mother and Alan panhandling with the children. According to the police report, the children were disheveled, cold, exhausted, underfed, dressed inappropriately for the cold weather and they showed signs of physical abuse. Mother and Alan were arrested for child endangerment after they refused multiple offers of emergency assistance. This evidence demonstrates that on multiple occasions, Mother knowingly placed or allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being and she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endanger their physical or emotional well-being. *See In re C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of endangerment grounds under Section 161.001(b)(1) and best interest).

The record also reflects that Mother and Alan used drugs and engaged in acts of domestic violence with the children present during the California trip. Such evidence also supports the trial court's best interest finding. *See In re K.K.*, No. 09-20-00300-CV, 2021 WL 2148857, at *4 (Tex. App.—Beaumont May 27, 2021, pet. denied) (mem. op.) (stating evidence parent exposed child to domestic violence supports trial court's finding that termination is in child's best interest); *see also* TEX. FAM. CODE § 263.306(b)(1) (identifying history of abusive or assaultive conduct by child's family as factor relevant to best interest analysis).

The record also reflects that on July 17, 2021, Alan was charged with assaulting Mother while she was pregnant with Jayla. The charge was dismissed less than a year later at Mother's request. During an October 7, 2021 hearing, Mother testified that she had not seen Alan since he assaulted her in July 2021, she had a restraining order against him, and she did not want to have any further contact with Alan. Mother's acts of maintaining contact with Alan, even sporadically, and exposing the children to domestic violence, and her failure or inability to protect the children from domestic violence, lying about her contact with Alan, and noncompliance with her service plan indicate that her parent-child relationship with the children is not a proper one. *See Holley*, 544 S.W.2d at 372; *see also In re K.K.*, 2021 WL 2148857, at *4. Mother's past endangering conduct is also an indication of her parenting abilities. *See In re H.M.O.L.*, No. 01-17-00775-CV, 2018 WL 1659981, at *18 (Tex. App.—Houston [1st Dist.] Apr. 6, 2018, pet. denied) (mem. op.) (citing *In re J.S.G.*, No. 14-08-00754-CV, 2009 WL 1311986, at *9 (Tex. App.—Houston [14th Dist.] May 7, 2009, no pet.) (mem. op.)).

The fact that Mother's rights to Tyler and Casey were terminated on endangerment grounds also supports a finding that termination of Mother's rights to Pia and Jayla was in their best interest. *See In re E.C.R.*, 402 S.W.3d at 249 (stating evidence parent's rights had been previously terminated to one child supported

finding that termination of parent's rights to another child was in that child's best interest).

Mother argues that she did not knowingly place or allow the children to remain in conditions or surroundings that endangered their physical or emotional wellbeing because she was forced by Alan to go to California and Alan was in control. Mother, however, also testified that Alan did not threaten her with a gun prior to leaving for California and she denied that he kidnapped her or the children. Furthermore, although Mother disputed that she had any control over the trip to California, it was within the trial court's province, as the sole arbiter of a witness's credibility, to disbelieve Mother's testimony and conclude, in light of the evidence, that Mother had knowingly placed or allowed her children to be placed in dangerous conditions. *See In re J.O.A.*, 283 S.W.3d at 346 (stating trial court is sole arbiter of witness' credibility and demeanor).

The child's need for a permanent home has been "recognized as the paramount consideration in a best interest determination." *In re B.J.C.*, 495 S.W.3d at 39 (noting that child's need for permanence through establishment of stable, permanent home is paramount consideration in best-interest determination). The record reflects that Mother failed to maintain suitable housing that is clean, stable, and free from safety hazards during the pendency of the case. Such evidence not only violated the terms of her FSP, it also supports the trial court's best interest finding. *See Holley*,

65

544 S.W.2d at 372 (recognizing stability of home and ability to provide for child's current and future physical and emotional needs as best-interest factors); *see also In re C.H.*, 89 S.W.3d at 28 (stating evidence supporting trial court's finding that parent failed to complete FSP also supported of finding termination of parent's rights is in child's best interest).

The record also reflects that Mother, who was pregnant with Pia, used marijuana and cocaine in August 2020 while Mother's four older children were in the Department's care. Mother also tested positive for marijuana when Jayla was born in February 2022, less a month after California authorities removed the children from Mother's care. *See In re D.M.M.*, No. 14-16-00664-CV, 2017 WL 61847, at *5 (Tex. App.—Houston [14th Dist.] Jan. 5, 2017, pet. denied) (mem. op.) ("Continued illegal drug use [by the parent] . . . is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct, and that termination is in the best interest of the child.").

Mother's FSP required her to submit to random and court-ordered drug testing. Although Johnson went over Mother's FSP with her on August 31, 2022, Mother did not submit to any drug tests in this case until January 2023. The three drug tests Mother took in 2023 were negative. *See In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.) (holding fact finder could infer that parent's failure to submit to court-ordered drug testing indicated parent was

66

avoiding testing because they were using narcotics); *see also In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child.").

The only excuse Mother provided for these acts and omissions was that she was a victim of domestic violence perpetrated against her by Alan. *See Holley*, 544 S.W.2d at 372 (stating any excuse for parent's acts or omissions is best interest factor). When the children were taken into care in March 2019, the Department created an FSP for Mother which required her to receive individual therapy and participate in a domestic abuse program. Mother did not do so. When the children were removed from her care again in January 2022, Mother's new FSP also required her to receive individual therapy and participate in a domestic abuse program. Although Mother was engaging in therapy, which includes the domestic abuse requirement, Mother waited until the eve of the first trial setting to begin participating in services and she had not completed these requirements. While Mother testified that she is learning a lot in therapy about herself and the cycle of domestic violence, she has not demonstrated that she is able to implement any of those skills or would otherwise be able to protect the children from Alan and shield them from future instances of domestic violence between the couple. *See In re M.L.L.*, 573 S.W.3d 353, 367 (Tex. App.—El Paso 2019, no pet.) (recognizing best

interest analysis focuses on child, not parent; "Mother was certainly the victim of domestic violence at the hands of her boyfriend, Rob, but the focus in determining best interest is necessarily on [her son] Mark.").

Pia, who was two years old when trial commenced, was fourteen months old when she was placed with Tanya and Kevin. Jayla, who was placed with Tanya and Kevin when she was six or seven weeks old, was one year old when trial commenced. The record thus reflects that Pia and Jayla have lived with Tanya and Kevin longer than they were with Mother who acknowledged at trial that Pia and Jayla "don't really know me because they've been away from me so long."[14] By all accounts, Tanya and Kevin have provided Pia and Jayla with a loving, safe, stable, nurturing, and drug-free home environment and both children are thriving in their care, thus demonstrating that Tanya and Kevin are able to meet the girls' present and future physical and emotional needs. There is also evidence in the record that Pia and Jayla are well bonded to Tanya and Kevin who adopted Pia and Jayla's biological brothers, Casey and Tyler in May 2023, and Tanya and Kevin planned to adopt Pia and Jayla if Mother's and Alan's rights to the girls were terminated. *See Holley*, 544 S.W.2d at 372 (recognizing child's present and future physical and

---

[14]    The trial court prohibited Mother from having any contact with the children during the pendency of this case due to the risk that Mother or Alan would abduct the children. Although the court lifted the no-contact order in January 2023 for Anthony and Adrian, the court left the order in place for Pia and Jayla.

68

emotional needs, present and future emotional and physical dangers to child, parental abilities of persons seeking custody, plans for child by individuals seeking custody, child's desires, and stability of home or proposed placement as best interest factors); *see also In re M.D.M.*, 579 S.W.3d 744, 770 (Tex. App.—Houston [1st Dist.] 2019, no pet.) ("Evidence that a child is well-cared for by a foster family or a proposed adoptive placement, is bonded to the proposed placement, and has spent minimal time in the presence of the child's parent is relevant to the best interest determination and, specifically, is relevant to the child's desires.").

Jayla's and Pia's young ages alone also weigh in favor of the trial court's finding that termination of Mother's parental rights is in their best interests. *See In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (noting that young age of child—fourteen months at time of trial—weighed in favor of trial court's finding that termination was in child's best interest); *see also In re A.L.B.*, No. 01-17-00547-CV, 2017 WL 6519969 *5 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (mem. op.) (stating children's young ages—five and six years old—rendered them "vulnerable if left in the custody of a parent unable or unwilling to protect them or to attend to their needs").

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that termination of Mother's parental rights was in Jayla and Pia's best interest. *See In*

*re J.F.C.*, 96 S.W.3d at 266. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination of Mother's parental rights was in Jayla and Pia's best interest. *Id.*; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

We overrule Mother's fifth issue.

## Conservatorship

Mother filed a separate appeal in a companion case challenging the trial court's order appointing Anna—Anthony's and Adrian's paternal grandmother—as the boys' sole managing conservator and Mother as the boys' possessory conservator. In her sole issue on appeal, Mother argues there is legally and factually insufficient evidence supporting Anna's appointment as Anthony's and Adrian's sole managing conservator.

## A. Standard of Review and Applicable Law

We review conservatorship decisions for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d at 616; *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, pet. denied). A trial court abuses its discretion if its decision is arbitrary and unreasonable. *In re J.A.J.*, 243 S.W.3d at 616; *In re J.J.G.*, 540 S.W.3d at 55. Thus, in reviewing a trial court's conservatorship decision for an abuse of discretion, we examine whether the court acted without reference to any guiding rules or principles.

*In re J.J.G.*, 540 S.W.3d at 55. A trial court does not abuse its discretion when it bases its decision on conflicting evidence or so long as some evidence of substantive and probative character supports its decision. *Id.* Under an abuse of discretion standard, legal and factual insufficiency are not independent grounds of error but rather are relevant factors in assessing whether the trial court abused its discretion. *Id.*

The primary consideration in determining issues of conservatorship is always the children's best interest. *See* TEX. FAM. CODE § 153.002. Best interest determinations in the conservatorship context are reviewed in connection with the non-exhaustive factors set out in *Holley*. A trial court has "wide latitude" in determining best interest and may impose any conditions it finds necessary for the child's best interest. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982).

Family Code Section 153.005 authorizes the appointing of a managing conservator and provides that the conservator must be "a parent, a competent adult, the Department of Family and Protective Services, or a licensed child-placing agency." TEX. FAM. CODE § 153.005(b); *see also In re J.A.J.*, 243 S.W.3d at 614. Section 153.131 creates a rebuttable presumption that the appointment of a parent as managing conservator is in the best interest of the children unless the trial court finds that the appointment of the parent "would not be in the best interest of the child[ren] because the appointment would significantly impair the child[ren's] physical health

or emotional development." *See* TEX. FAM. CODE § 153.131(a), (b); *In re T.S.*, No. 01-22-00054-CV, 2022 WL 4474277, at *45 (Tex. App.—Houston [1st Dist.] Sept. 27, 2022, no pet.) (mem. op.).

Under Section 263.3026, the Department can request the trial court to award the "permanent managing conservatorship of the child to a relative or other suitable individual." TEX. FAM. CODE §§ 263.3026(a), 263.404; *In re A.J.I.L.*, No. 14-16-00350-CV, 2016 WL 6110450, at *7 (Tex. App.—Houston [14th Dist.] Oct. 18, 2016, pet. denied) (mem. op.). In the event termination of the parent-child relationship is not ordered by the trial court in a suit seeking termination, the trial court shall either deny the petition or "render any order in the best interest of the child." TEX. FAM. CODE § 161.205(2); *In Interest of A.D.*, 480 S.W.3d 643, 645 (Tex. App.—San Antonio 2015, pet. denied).

**B. Analysis**

Mother does not contest that the parental presumption was rebutted in this case nor is she asking to be named managing conservator. Mother's sole challenge is to Anna's appointment as the boys' managing conservator.

To the extent Mother is challenging Anna's standing to be named Anthony's and Adrian's managing conservator, this argument is not persuasive. When a suit affecting the parent-child relationship is initiated by the Department for the protection of the child, such as here, the standing provisions of the Family Code are

72

not applicable to a non-party receiving conservatorship through the Department's filings. *In re A.D.*, 480 S.W.3d at 645 (stating "the standing provisions of the Family Code are not applicable to cases instituted by the Department for the protection of the children"); *see also In re A.J.I.L.*, 2016 WL 6110450, at *7 (holding trial court does not abuse its discretion when naming nonparty relative managing conservator even if nonparty relative is not named in such proceedings because Family Code's standing requirements do not apply in cases brought by Department).

We further conclude that there is some evidence of a substantive and probative character to support the trial court's decision to appoint Anna as the boys' permanent managing conservator. Under Family Code Section 263.3026, the Department can seek to have the trial court award the "permanent managing conservatorship of the child to a relative or other suitable individual" in accordance with the goals of its permanency plan. TEX. FAM. CODE § 263.3026(a)(3).

During the January 26, 2023 permanency hearing, Johnson testified that the Department's primary permanency goal for Anthony and Adrian is relative adoption and the Department's concurrent permanency goal for the boys is relative conservatorship. Johnson testified that Anthony and Adrian were living with Anna, their paternal grandmother. According to Johnson, Anna was the boys' primary caregiver and she had been "involved in this case and different evolutions of this case for several years." Johnson agreed that Anna's home was more than suitable

73

for the boys and that Anna was very protective of the boys and involved in their welfare. The July 26, 2023 permanency report states the Department's primary permanency goal for Anthony and Adrian is relative adoption and the Department's concurrent permanency goal for the boys is relative conservatorship. The report states that both boys are in relative placements with Anna, and that Anna is a licensed foster parent who had been verified by a licensed child-placing agency to qualify for permanency care assistance benefits.

In accordance with the goals of its permanency plan, the Department asked the trial court to terminate Mother's and Aaron's parental rights to Anthony and Adrian and to appoint the Department as the boys' permanent managing conservator to allow Anna to adopt Anthony and Adrian. After hearing closing arguments from the other parties, the Department argued that if the court appointed Anna as Anthony's and Adrian's sole managing conservator and Mother and Aaron as their possessory conservators, the court should place certain limitations on Mother's and Aaron's rights. The appointment of Anna as the boys' sole managing conservator is in accordance with the Department's concurrent permanency goal for the boys, relative conservatorship. Anna has attended all the hearings in this case and testified at the January 26, 2023 permanency hearing and at trial. *See In re C.S.*, 264 S.W.3d 864, 869 (Tex. App.—Waco 2008, no pet.) (holding trial court did not err by

74

appointing nonparents as joint managing conservators when Department had initiated proceedings and properly identified nonparents as relative caregivers).

As the petitioner, the Department was also required to prove it was in Anthony's and Adrian's best interests to have Anna appointed as their permanent managing conservator. TEX. FAM. CODE § 263.3026(a)(3). Courts consider the non-exhaustive factors identified in *Holley* when assessing whether a conservatorship decision is in the child's best interest. *See In re K.M.L.*, 443 S.W.3d 101, 116 (Tex. 2014); *see also Gillespie*, 644 S.W.2d at 451 (stating trial court has "wide latitude" in determining best interest). The evidence need not prove all statutory or *Holley* factors to demonstrate that the conservatorship decision is in a child's best interest. *See Holley*, 544 S.W.2d at 372; *see also In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth 2001, no pet.) ("'Best interest' does not require proof of any unique set of factors, nor does it limit proof to any specific factors.").

Mother, whose best interest argument does not address the *Holley* factors, argues that "[i]n what appears to be an analysis of best interest," the Beaumont Court of Appeals' opinion in *In re G.B.*, No. 09-15-00285-CV, 2016 WL 157842, at *5 (Tex. App.—Beaumont Jan. 14, 2016, no pet.) (mem. op.) "sets out a quasi-due process analysis by taking into account the participation of the nonparty" when determining whether a court abuses its discretion by appointing a nonparty relative as a conservator. We understand Mother to argue that a nonparty's degree of

75

participation in the legal proceeding is a relevant factor courts should consider when assessing whether the appointment of the non-party as a conservator is in the child's best interest. According to Mother, the court in *In re G.B.* noted that (1) the Department asked the trial court to name a relative as the child's managing conservator in its pleadings, (2) the Department indicated in its opening statement that it wanted the court to name the nonparty relative as G.B.'s permanent managing conservator, (3) the Department's recommendation was based in part on the nonparty relative's favorable home study, (4) the nonparty relative testified that she wanted to be given custody, (5) the evidence supported the trial court's implied finding that naming the nonparty relative as the managing conservator offered a "safe and stable placement," and (6) the Department's permanency plan supported naming the nonparty relative as G.B's permanent managing conservator. Mother argues that unlike in *In re G.B.*,

> There is no indication that a home study was done on [Anna] after the filing of this suit on March 17, 2022. There was no mention of [Anna] being named as the sole managing conservator of the children in any opening statement made by the Department or any other party. None of the parenting plans filed by the Department indicated that [Anna] should be named as the sole managing conservator of the children.

We do not find Mother's arguments persuasive. By all accounts, Anna is protective of Adrian and Anthony, she has provided the boys with a loving, safe, and stable home, and she has been able to meet the boys' physical and emotional needs. *See Holley*, 544 S.W.2d at 372 (identifying child's present and future physical and

emotional needs, present and future emotional and physical danger to child, and stability of home or proposed placement as best interest factors). The evidence reflects the boys love Anna, they are bonded with her, and they want to continue living with her. Anthony and Adrian also told their ad litem that they wanted Anna to adopt them. *See id.* (identifying desires of child as best interest factor). Mother agrees that Anna has done a good job caring for the boys.

The record reflects Anthony and Adrian lived with Anna from the time they were born until Mother moved out of Anna's home when the boys were two and three years old. Although Anna attempted to stay in contact with the boys after Mother moved out, Anna was not able to see her grandsons for about two years because Mother stopped allowing Anna and Aaron to visit the boys a few months after Mother began dating Alan.

In March 2019, Anna became involved in the boys' lives again when Anthony and Adrian were placed in her care after Alan kidnapped the boys at gunpoint. Aside from the four months the boys were either in Mother's care or in foster care in California, Anna's home is the only place Anthony and Adrian lived from March 2019 until trial. After she had not heard from the boys in a while, Anna, who was worried about Anthony and Adrian after they were returned to Mother in November 2021, figured out where the boys had been attending school. When she and Aaron went to the boys' schools, however, they learned that Mother had withdrawn them

from the school. Anna continued to search for the boys, and she knew before the Department did that the boys had been taken into care by CPS in California after Mother was arrested for child endangerment.

Anna enrolled the boys in therapy after they returned from California and she and Tanya arranged for all six kids to have regular sibling visits. Anna also knows that the boys love their parents, and they want to stay in contact with them, and Anna testified she will allow Aaron and Mother to communicate with the boys as long as it is in the boys' best interest.

Although there is no evidence the Department prepared a home study for Anna, there is evidence that Anna is a licensed foster parent who has been through the verification process. She has attended every hearing and meeting in the boys' case, and she has been in a regular contact with the Department since the boys were placed with her in March 2019.

Viewing the evidence in the light most favorable to trial court's finding, we conclude the trial court could have formed a firm belief or conviction that appointing Anna as Anthony's and Adrian's permanent managing conservator was in the boys' best interest. *See In re J.F.C.*, 96 S.W.3d at 266. Further, in view of the entire record, we conclude that the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that appointing Anna as

Anthony's and Adrian's permanent managing conservator was in the boys' best interest. *Id.*; *see also In re Commitment of Stoddard*, 619 S.W.3d at 674.

Because there is some evidence of a substantive and probative character to support the trial court's decision to appoint Anna as the boys' permanent managing conservator, the trial court did not abuse its discretion by doing so.

To the extent Mother argues that Anna's appointment as the boys' managing conservator violates Mother's right to due process, Mother did not preserve this issue for our review. To preserve a complaint for appellate review, an appellant must show (1) she made the complaint to the trial court by a timely request, objection, or motion, and (2) the trial court ruled on the request or refused to rule on the request and appellant objected to the refusal. *See* TEX. R. APP. P. 33.1(a); *see also In re B.L.D.*, 113 S.W.3d 340, 350 (Tex. 2003) (observing, in context of parental rights termination, that "applying our preservation rules" generally does not deprive parties of due process rights); *In re M.J.M.L.*, 31 S.W.3d 347, 352 (Tex. App.—San Antonio 2000, pet. denied) ("Constitutional issues must be properly raised in the trial court or they are waived on appeal."). Notably, Mother did not object when, during closing arguments, the children's attorney ad litem expressly asked the trial court to consider appointing Anna as the boys' sole managing conservator and the parents as possessory conservators. Mother is raising this issue for the first time on appeal. Because Mother did not object in the trial court that Anna's appointment as the boys'

79

sole managing conservator violated Mother's rights to due process or otherwise raise this issue in the trial court, Mother has not preserved this issue for our review. *See* TEX. R. APP. P. 33.1(a); *see also In re B.L.D.*, 113 S.W.3d at 350; *In re M.J.M.L.*, 31 S.W.3d at 352.

Even if Mother had preserved this issue for our review, she still would not prevail on appeal. Mother argues that because Anna was not named as a formal party or expressly identified as the relative the Department requested be appointed as the boys' conservator in the event the trial court did not terminate Mother's and Aaron's rights, Mother was not able to fully litigate whether Anna's appointment would be in the boys' best interest. According to Mother, "it was never made clear until the end of the litigation after evidence was presented that [Anna] would be a choice for sole managing conservatorship of the children." We disagree.

As previously discussed, the Department's primary permanency goal for Anthony and Adrian was relative adoption and its concurrent permanency goal for the boys was relative conservatorship. The Department repeatedly identified Anna as the boys' current placement and caregiver. Anna testified at trial that she wanted to adopt the boys if Mother's and Aaron's parental rights were terminated, and the Department asked the trial court to appoint the Department as the children's managing conservator so that Anna could adopt the boys. Mother testified at trial that she had a good relationship with Anna in the past and she wanted to "build a

80

relationship" with Anna going forward. Mother also acknowledged that Anna had done a good job caring for the boys and she stated that she would let the boys live with Anna, if that is what they wanted to do.

Furthermore, the record reflects that Mother's counsel cross-examined Anna at trial regarding the people Anthony and Adrian would be exposed to at her home and her ability to protect the boys. Mother's counsel introduced evidence that Anna's brother had been charged with assaulting a family member and inquired whether Anna's brother visited her home. Mother's counsel also introduced evidence that Anna's son, Aaron, had two pending criminal cases and counsel elicited testimony as to whether Anna allowed Aaron to have unsupervised visitation with the boys in contravention of the court's orders. These areas of inquiry were relevant to determine whether Anna's appointment as conservator would be in the boys' best interest and they reflect that contrary to Mother's argument on appeal, Mother was able to litigate this issue in the trial court.

We overrule Mother's sole issue with respect to Anna's appointment as the boys' sole managing conservator.

## Conclusion

We affirm the trial court's final decree terminating Mother's parental rights to Jayla and Pia and we affirm the trial court's order appointing Anna as Anthony's and Adrian's sole managing conservator.


Veronica Rivas-Molloy
Justice


Panel consists of Justices Kelly, Countiss, and Rivas-Molloy.